**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**MCP IP, LLC,**

        **Plaintiff,**

   **v.**
                              **Civil Action 2:21-cv-581**
                              **Chief Judge Algenon L. Marbley**
                              **Magistrate Judge Chelsey M. Vascura**

**.30-06 OUTDOORS, LLC,** *et al.*,

        **Defendants.**

**REPORT AND RECOMMENDATION**

Plaintiff, MCP IP, LLC, brings this action for patent and trademark infringement against Defendants, .30-06 Outdoors, LLC, and Daibow Inc. Following the Court's entry of default judgment against Defendants as to liability, the District Judge referred the matter to the undersigned, pursuant to Federal Rule of Civil Procedure 55(b)(2) and 28 U.S.C. § 636(b)(1), for a damages hearing and report and recommendation as to the appropriate amount of damages stemming from Defendants' infringement of Plaintiff's design and utility patents. (Op. & Order 17, ECF No. 42.) For the reasons that follow, the undersigned **RECOMMENDS** that Plaintiff be awarded a total of $46,395.82 in damages against Defendant Daibow, Inc. and that Plaintiff be awarded a total of $34,150.91 in damages against Defendant .30-06 Outdoors, LLC.

## I.      BACKGROUND

Plaintiff brought suit against Defendants for infringement of Plaintiff's design and utility patents for certain components of archery bows. Plaintiff alleges that Defendant Daibow manufactures archery equipment in China and distributes it in the United States via an exclusive

partnership with Defendant .30-06. On August 16, 2022, the Court entered default judgment against both Defendants as to Plaintiff's claims for utility and design patent infringement. (ECF No. 42.) On Plaintiff's motion, the Court clarified the article of manufacture for the each of the two design patents at issue on November 21, 2022. (ECF No. 48.) Namely, the Court determined that the relevant article of manufacture for the Flatline Stabilizer patent family is Defendants' infringing Navi Stabilizer in its entirety, whereas the Focus Grip patent family is limited to the infringing grip design as a component of Defendants' M1/Topoint M1 bows. (*Id.* at 1.)

A damages hearing was held before the undersigned on February 22, 2023. At the damages hearing, the Court heard testimony from Jeffrey Ozanne, VP of Legal Operations for Mathews Archery, Inc. Mathews Archery manufactures Mathews and Mission archery bows and accessories and is a non-exclusive sub-licensee to Plaintiff's patents. Additionally, Mr. Matthew McPherson, the sole member of Plaintiff, is also the CEO of Mathews Archery. The Court also heard testimony from Richard F. Bero, Plaintiff's damages expert.

## II.     ANALYSIS

### A.     Design Patents

#### 1.     Standards for Assessing Design Patent Damages

Plaintiff is entitled to the total profits apportioned to the infringing article of manufacture of its design patents. 35 U.S.C. § 289 ("Whoever during the term of a patent for a design, without license of the owner . . . sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit . . . ."). It is Plaintiff's burden to prove the Defendants' gross profits by a preponderance of the evidence. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1310 (Fed. Cir. 2018);

*Evriholder Prod. LLC v. Simply LBS Ltd. Co.*, No. 17CV4329RABCM, 2020 WL 7060336, at *7 (S.D.N.Y. Apr. 21, 2020).

The best evidence of a defendant's profits are the defendant's own records, and courts generally rely on a defendant's records even in the default judgment context to the extent they are available. *See*, *e.g.*, *Evriholder*, 2020 WL 7060336, at *7; *Progressive Int'l Corp. v. AMGTM LLC*, No. C17-448 RAJ, 2018 WL 4091694, at *4 (W.D. Wash. Aug. 21, 2018); *Oakley, Inc. v. Moda Collection, LLC*, No. 8:16-CV-160-JLS-JCGX, 2016 WL 7495837, at *3 (C.D. Cal. Sept. 28, 2016); *Junker v. HDC Corp.*, No. C-07-05094 JCS, 2008 WL 3385819, at *4 (N.D. Cal. July 28, 2008).

A plaintiff is necessarily at a disadvantage in proving defendants' profits when the defendants are in default and have not provided their own revenue and cost records; but in this situation, courts typically accept non-speculative evidence from other sources to estimate the defendant's profits. *See*, *e.g.*, *2109971 Ontario Inc. v. Matrix Hosp. Furniture Inc.*, No. CV2111412KMCLW, 2022 WL 154411, at *5 (D.N.J. Jan. 14, 2022) (relying on plaintiff's CEO's business experience and the sale price of the merchandise to estimate defendant's profit margin); *Pretty Star Store, LLC v. Chen*, No. LACV1805187JAKAGRX, 2019 WL 13039951, at *2 (C.D. Cal. May 8, 2019) (using plaintiff's profit margin to estimate defaulting defendant's profit margin); *Govino, LLC v. WhitePoles LLC*, No. 416CV06981JSWKAW, 2017 WL 6442187, at *11 (N.D. Cal. Nov. 3, 2017), *report and recommendation adopted*, No. 16-CV-06981-JSW, 2017 WL 6442188 (N.D. Cal. Dec. 11, 2017) (accepting a third-party manufacturer's likely cost of production to establish defaulting defendant's costs); *Deckers Outdoor Corp. v. ShoeScandal.com, LLC*, No. CV 12-7382 ODW SHX, 2013 WL 6185203, at

*2–3 (C.D. Cal. Nov. 25, 2013) (accepting third-party seller's records of defendant's sales and industry average profit margin to establish defaulting defendant's profits).

However, if the plaintiff is unable to provide non-speculative evidence of the defaulting defendant's profits, courts will deny requests for damages without prejudice to supplementing their evidentiary submissions. *See*, *e.g.*, *Sundesa, LLC v. IQ Formulations, LLC*, No. CV1906467ABMAAX, 2020 WL 3067383, at *3 (C.D. Cal. Feb. 27, 2020) (denying default judgment without prejudice when plaintiff failed to offer any evidence of profits, and suggesting that plaintiff consider subpoenas to third-party sellers like eBay or Amazon to establish defaulting defendant's sales); *IP Power Holdings Ltd v. Bam Brokerage Inc.*, No. SACV1101234JVSANX, 2014 WL 12589630, at *4–5 (C.D. Cal. Mar. 3, 2014) (rejecting the use of defaulting defendant's total revenues as a measure of total profits, rejecting plaintiff's "speculation that wholesalers earn a 40–6-% profit margin" as "unsupported," and ultimately denying plaintiff's request for damages without prejudice).

At the hearing and in its Pre-Hearing Statement, Plaintiff contended that because Defendants are in default and have not provided evidence of their costs or profit margins, the Court should award Defendants' total sales revenue as a measure of profits, citing *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1447 (Fed. Cir. 1998). However, the *Nike* Court notes only that at the district court level, *"[i]t was agreed* that [accused infringers] Wal–Mart and Hawe Yue had the burden of proving costs deductible from revenues in arriving at a profit figure." *Id.* (emphasis added). The defendants produced an expert report, but the district court excluded it due to the timing of its production to the plaintiff. *Id.* "The district court adopted the general methodology of [Plaintiff] Nike's expert, but deducted certain cost items that Nike's expert stated should not be deducted. Specifically, the court subtracted from Wal–Mart's revenue

the direct cost of freight-in and the indirect costs of customer returns, shrinkage, and attributable

indirect expenses." *Id.* Accordingly, even the authority relied on by Plaintiff does not support the

use of total revenues as a measure of total profits, and in fact supports the subtraction of costs

even over uncontroverted expert opinion to the contrary. Further, as discussed below, .30-06 *did*

provide some information as to its costs, and the Court will make use of this information in

calculating Defendants' profits.

2.      **Defendants' Profits Attributable to Products Infringing Plaintiff's Design Patents**

Although Plaintiff obtained a default judgment against Defendants with regard to two

design patent families (the Focus Grip and Flatline Stabilizer families), Plaintiff's counsel

advised at the damages hearing that Plaintiff waived its nominal damages associated with the two

units of the Navi Stabilizer sold by Defendant Daibow. Accordingly, the undersigned analyzes

and recommends awarding design patent damages only with regard to Plaintiff's Focus Grip

patent family.

The only product of Defendants that was alleged to have infringed Plaintiff's Focus Grip

patent family is the Daibow M1/Topoint M1 archery bow (the "M1 bow"). .30-06 provided

records reflecting that .03-06 purchased 827 units of the M1 bow from Daibow for a total of

$78,565.00 and that .03-06 sold those same 827 units of the M1 bow for a total of $117,392.00.

.30-06's gross profit margin on the entire M1 bow was therefore 33.07%. However, the relevant

article of manufacture is the limited to the bow's grip, however, and not the entire bow. The

undersigned therefore uses $59.99, the price at which Mathews Archery currently sells a similar

standalone grip, to estimate .30-06's profits. Mr. Ozanne testified at the hearing that the Mathews

Archery Focus Grip was substantially similar to the grip used in the M1 bow, and Mr. Bero

testified that it was reasonable to assume the same profit margin applied to both the bow as a

whole and the grip. Accordingly, the undersigned estimates .30-06's gross profits associated with the Focus Grip design patent at 827 units x $59.99 retail price x 33.07% profit margin = $16,408.91.

As for Daibow's profits, Mr. Bero assumed that .30-06 would have paid Daibow the same proportional cost of the grip's retail price as it paid for the entire M1 bow's retail price, *i.e.*, 66.93%. Accordingly, Daibow's estimated sales revenue for the grip component of the M1 bow is 827 units x $59.99 retail price x 66.93% cost = $33,202.82. Both Mr. Ozanne and Mr. Bero testified that Daibow's cost per unit to manufacture the grips would not have exceeded $5.00. Accordingly, the undersigned estimates Daibow's gross profits associated with the Focus Grip design patent at $33,202.82 – (827 units x $5.00 cost) = $29,067.82.

**B.      Utility Patents**

**1.      Standards for Assessing Utility Patent Damages**

For each infringed utility patent, Plaintiff is entitled to no less than "a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Although there are several approaches to determining a reasonable royalty, the most common is the "hypothetical negotiation" or the "willing licensor-willing licensee" approach. *Lucent*, 580 F.3d at 1324. Plaintiff has based its request for utility patent damages on this approach.

The hypothetical negotiation approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (quoting *Lucent*, 580 F.3d at 1324). Courts applying the hypothetical approach typically consider the fifteen factors set forth in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir.

6

2011) ("This court has sanctioned the use of the *Georgia–Pacific* factors to frame the reasonable royalty inquiry. Those factors properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue."). However, use of the *Georgia-Pacific* framework is not mandatory. *See Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) ("[T]his court does not endorse *Georgia–Pacific* as setting forth a test for royalty calculations, but only as a list of admissible factors informing a reliable economic analysis."). Further, not all *Georgia-Pacific* factors will be applicable to each case, and the Court need only consider those that are applicable. *See Lucent*, 580 F. 3d at 1325, 1335 ("focus[ing] . . . on the relevant *Georgia-Pacific* factors" and discussing "*Georgia-Pacific* factors applicable here").

> The *Georgia-Pacific* factors are:
>
> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
>
> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
>
> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
>
> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
>
> 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.
>
> 6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
>
> 7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee— who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention— would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pacific*, 318 F. Supp. at 1120.

In addition to or in conjunction with the *Georgia-Pacific* factors, parties "may use the royalty rate from sufficiently comparable licenses" to establish a reasonable royalty. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). "[A]ny reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" *Lucent*, 580 F.3d at 1325 (quoting *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995)). However, it is the plaintiff's burden to prove that the licenses relied on are "sufficiently comparable" to support the requested damages award. *Lucent*, 580 F.3d at 1332. "[A]lleging a

loose or vague comparability between different technologies or licenses does not suffice."
*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). Thus, the

Federal Circuit has "cautioned that district courts performing reasonable royalty calculations

must exercise vigilance when considering past licenses to technologies other than the patent in

suit and must account for differences in the technologies and economic circumstances of the

contracting parties." *Virnetx*, 767 F. 3d at 1308 (cleaned up). A plaintiff may not rely on other

license agreements when there is insufficient information in the record as to the subject matter of

those agreements. *See Lucent*, 580 F.3d at 1327–28, 1335–36 (vacating a jury award of

reasonable royalty damages in part because the parties provided insufficient information at trial

for the jury to evaluate the subject matter of relied-upon licenses or their comparability to patent

in suit).

   **2.**   **Reasonable Royalties Attributable to Plaintiff's Utility Patent Families**

   Plaintiff obtained default judgment for liability as to Defendants' infringement of five

utility patent families; however, damages as to one of those families, the Focus Grip, have

already been addressed above in relation to Defendants' infringement of the Focus Grip design

patent. As Plaintiff recognizes, it cannot recover both profits damages under § 289 and

reasonable royalty damages under § 284 for the same patents. *See*, *e.g.*, *Catalina Lighting, Inc. v.*

*Lamps Plus, Inc*., 295 F.3d 1277, 1291 (Fed. Cir. 2002). Accordingly, the undersigned

determines reasonable royalties only as to the remaining four utility patent families.

   The **Reverse Wrap** patent family refers to an archery bow including a cam design that

supports a power cable that wraps around a capstan and toward a terminal on the cam in a

direction that is opposite to the direction of rotation of the cam when the bow is drawn. Plaintiff

licensed this patent family in a 2014 license agreement with a competitor at $12.00 per unit.

(ECF No. 54-4.) Further, in 2017, Plaintiff reached a settlement with an alleged infringer, in

which Plaintiff settled for a lesser royalty per unit for past infringement; but the settlement

agreement acknowledges that this is "a significant reduction from the typical $12.00 per bow

royalty typically offered to licensees concerning" this patent family. (ECF No. 54-5.) The

undersigned finds that these agreements sufficiently establish a reasonable royalty for the

Reverse Wrap patent family at $12.00 per unit. .30-06's sales records reflect that it purchased

1,034 bows from Daibow that infringe on the Reverse Wrap patent family, and that .30-06 sold

those 1,034 bows to customers. As a result, Plaintiff is entitled to a reasonable royalty in the

amount of $12.00 x 1,034 units = $12,408.00 from each of Daibow and .30-06 for the Reverse

Wrap patent family.

The **Reverse Assist Cable Guard** patent family refers to an archery bow having a cable

guard attached to a riser of the bow and positioned to bias a power cable away from the riser.

Plaintiff agreed in 2020 to license this patent family to a company for $8.00 per unit. (ECF No.

58.) However, Mr. Ozanne testified that Plaintiff agreed to license this patent family at this price

to this particular company only because that company intended to produce much smaller bows

that did not compete with Plaintiff's larger bows; Plaintiff would have insisted on a much higher

royalty if it licensed the patent to a direct competitor like Defendants, and more likely would not

have agreed to license this patent family to a direct competitor at all. In light of the non-

competitive market associated with the existing $8.00 royalty for this patent family, the

undersigned finds $9.00 per unit to be a reasonable royalty for the Reverse Assist Cable Guard

patent family. .30-06's sales records reflect that it purchased 83 bows from Daibow that infringe

on the Reverse Assist Cable Guard patent family, and that .30-06 sold those 83 bows to

customers. As a result, Plaintiff is entitled to a reasonable royalty in the amount of $9.00 x 83

units = $747.00 from each of Daibow and .30-06 for the Reverse Assist Cable Guard patent family.

The **Swivel Cable Guard** patent family refers to a compound archery bow that includes a cable guard that is mounted to a riser of the bow and formed by a body and a cable retaining member that is pivotally coupled and rotatable relative to the body. Plaintiff has licensed this patent family only in a 2016 cross-license agreement with no royalties changing hands; therefore, this cross-license agreement "provides no royalty guidance." (Bero Decl. ¶ 37, ECF No. 54-1.) Although there is no existing license agreement setting forth a per-unit royalty for this patent family, Mr. Ozanne's hearing testimony established that the Swivel Cable Guard patent family is sufficiently comparable to the Reverse Assist Cable Guard patent family such that it is reasonable to use the same royalty rate for the two families. *See Lucent*, 580 F.3d at 1332; *LaserDynamics*, 694 F.3d at 79. Accordingly, the undersigned finds $9.00 per unit to be a reasonable royalty for the Swivel Cable Guard patent family. .30-06's sales records reflect that it purchased 83 bows from Daibow that infringe on the Swivel Cable Guard patent family, and that .30-06 sold those 83 bows to customers. As a result, Plaintiff is entitled to a reasonable royalty in the amount of $9.00 x 83 units = $747.00 from each of Daibow and .30-06 for the Swivel Cable Guard patent family.

Finally, the **Bow Limb Bearing Accessory** patent family refers to an archery bow having a bearing accessory that is attached to one of the limbs and which defines a curved surface that is designed to interface with a bow press. In February 2020, Plaintiff settled with a competitor for past infringement of this patent family at $2.00 per unit. (ECF No. 58-1.) Mr. Ozanne testified at the damages hearing that this rate was substantially discounted due to the contentious litigation that preceded the settlement. Accordingly, the undersigned finds $3.00 per unit to be a

11

reasonable royalty for the Bow Limb Bearing Accessory patent family. .30-06's sales records reflect that it purchased 1,142 bows from Daibow and 138 bows from a distributor other than Daibow that infringe on the Bow Limb Bearing Accessory patent family, and that .30-06 sold those 1,280 bows to customers. As a result, Plaintiff is entitled to a reasonable royalty in the amount of $3.00 x 1,142 units = $3,426.00 from Daibow and $3.00 x 1,280 units = $3,840.00 from .30-06 for the Bow Limb Bearing Accessory patent family.

### III.    DISPOSITION

For the foregoing reasons, it is **RECOMMENDED** that Plaintiff be awarded a total of $46,395.82 in damages against Defendant Daibow, Inc. and that Plaintiff be awarded a total of $34,150.91 in damages against Defendant .30-06 Outdoors, LLC.

### PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report and Recommendation, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a *de novo* determination of those portions of the Report and Recommendation or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence, or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report

and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE